115-468 James Dept. in Eskola v. Elsta Police Dept. May I please the court, counsel, Sam Cuba on behalf of Petitioner James Hortincaso. My brief states I believe every issue the Commission decided was decided against the manifest weight of the evidence. I am aware that the manifest weight of the evidence is a high standard. However, when a decision regarding a question of fact is going to be made, and the definition is when an opposite conclusion is apparent, that's the case law. Respondent concedes the event happened. A policeman is in a domestic disturbance. These are notorious for people jumping around, changing their mind, jumping on his back. Whether the guy was smaller than Mr. Hortincaso or not, if he's jumping on your back and twisting you and you fall down, it's not unlikely at all that you would injure your back. And a lot of these disputes are red herrings. First of all, his testimony was I woke the next day. He's on a night shift, so his day is when he wakes up and he has some low back pain. And that's really a Sunday, so he goes to his chiro the first day, which is Monday, and reports I got hurt at work because I had low back pain. How can that not be an accident? Well, here's the thing, and I think this is looking at the overall record and looking at the record, as you said, I don't think the Respondent's attorneys are going to step up and say there was no incident, physical altercation in December at the scene of the domestic dispute. However, apparently the claimant never filled out any forms, and he filled out several forms between December and March of 2011 reporting the alleged work injury, and apparently he has expertise and actually trains officers on how to report these issues. So I don't think he's going to indicate at any time for months that he was injured as a result of this domestic disturbance. Because of all the baggage with his prior bad back. Yes, he's had training, but just as the Respondent's witness testified, there's a little bit of a difference of opinion there in the village of Elson as to whether an aggravation of preexisting condition counts as an accident or not. This man had a back surgery about a year or so before this. The last doctor visit after that back surgery, all of which is not compensable, that was just a back problem. He had MRIs, emergency room visits, injections. He had a bad back before. Nobody's disputing that, least of all the petitioner. The last doctor visit, though, shows herniated, no herniated nucleus puposus, and he's back as a police officer. He then goes roughly ten months to a chiropractor several times per month, and he's had a chronic one or a two if you want to look at a scale of ten. So that's the fact. This man is already at a one or a two or a three. But this is the man whose back they were jumping on and twisting and he fell, who felt back pain the next morning and reported it to the chiropractor. The arrest report, of course, is not an incident report. That's an arrest report that's written the night before he felt the back pain the next morning. Well, the real question is causation, isn't it? I mean, in other words, the real question is, is this as a result of his preexisting condition, his ongoing on-again, off-again back problems? Correct. Or is this some new injury as a result of this incident? And it appears that he didn't think it was a new injury because he reported it repeatedly as not a work incident. I'm glad you asked that question because I believe that supports my position. If you look at it with the petitioner's eyes. The petitioner is not a doctor. The petitioner is not a lawyer. The petitioner does not know the pattern of jury instruction 1501, how it defines aggravation of a preexisting condition. He probably did think it was more of the same for a while. And he did notify them his back hurt and he had to be off, so that's imperfect notice, not no notice. But what do we have? We have an MRI before this accident. And he goes for another MRI after calling the guy who did the first back surgery, 18 days after this accident. And that MRI shows a tear that was not present on the prior MRI. What happened in that 18 days that's different? People were fighting with him, twisting on him, jumping on his back, and he fell to the floor and felt back pain the next morning and went to his car and reported it. That's after that MRI, and that's a red herring too, and respondent conceded as much as the gentleman, and if you look at the record, it was a little plastic snow, he just moved a little, and that's after he was diagnosed with the back injury that resulted in the disc. If that snow shoveling incident was a few days before the MRI, I imagine I'd have a problem, and I imagine Dr. Bernstein would have put that in the report. Interestingly enough, Dr. Bernstein in his report says I read the chiropractor record, so there's no reference to the accident. Well, he must have missed the part where he says, she says, the chiropractor, he hurt his back at work. I'm still waiting to hear how, in response to Justice Stewart's question, the failure to know that it's the precipitating cause helps your client. Well, if he does not know that it's the precipitating cause, then we have no impeachment, do we? If you have a man who has a very bad back, he's had prior surgeries, he's going to a chiropractor on an ongoing basis, and before the surgery, the prior surgery, he's had injections and things, clearly he's had a bad back. This is not a man who's a zero or a If you read through those records, there's some precipitating little thing, which just went away with a few chiro visits. This one didn't go away. This one progressed rather rapidly after the accident, couldn't get out of bed. And he called the physician's assistant and answered her questions. There was no question from the physician's assistant if this was related to work or not. And also, he took that form, and the secretary for the village said that initial form was just copied over again and again. It's every two weeks for off work. So I don't see that as impeachment. The mere fact that somebody doesn't fill out the paperwork right, and I've cited the whole line of cases, it's my word to say it's a shotgun approach, but it does seem to happen with some frequency when there's a case like this, when there's a case where you have somebody with baggage, where you have a lot of different paperwork forms that say something is and is not related. The real question is, did something happen at work, and does the medical evidence show that it's causally connected? Because if it does, then it doesn't matter what's on those forms. Go ahead. We have differing medical opinions on whether there's a causal link. I do not think so. Dr. Bernstein, you can't count his one page report where he says he read the chiral notes and doesn't see the accident. Doesn't comment at all on the fact that there's an MRI that shows there's a tear that wasn't on the last MRI when that MRI is just 18 days after this accident? How does Calavo, it's Dr. Calavo, is that right? Correct. How does he explain, if it's his opinion that that tear occurred in this incident, why was it that it wasn't until the 25th or 26th that he couldn't get out of bed? You understand what I'm saying? I understand. The petitioner's testimony was it got progressively worse, Your Honor. So you do have, that's a common problem. How did Calavo explain that, though? I mean, if there was an acute injury? Well, Calavo's exact words can be found in my brief, and I quote what he said. Calavo's exact words when he tied it in is that he had looked at this as being a minor low-grade problem versus his current problem, which is, you know, a chiropractor. I think it's apples and oranges. Do you have an opinion based on a reasonable degree of medical and surgical certainty whether or not the treatment suggestion is due in whole or in part to the event that he told you about? I do have an opinion. I think it was triggered or aggravated or accelerated by this injury. So he is giving a specific opinion, and these tears on the top page of the record, he testified that it was not due to no apparent cause. Specifically, record at 6-21. You understand what my question is, though? Yes. I mean, you know, it was December 25th or sometimes 26th. He said, I was in so much pain I couldn't get out of bed, and then he reported repeatedly to doctor's offices on some of the farms that for no apparent reason he couldn't get out of bed that morning. So if there was an acute injury on the 11th that showed up on the MRI, what medical explanation is there in the record for why it wasn't until two weeks later that he really suffered pain and couldn't get out of bed? The petitioner testified that the pain was acute after the accident. He woke up the next morning in pain, and it got worse to the point where he couldn't get out of bed a couple weeks later. And Calavo testified that the current condition of ill being was not triggered by no apparent cause. There's nothing left. If it's not no apparent cause, and it's aggravating what was there before, and it's a trauma where people are jumping on your back and you wrestle to the floor, what else could it be? The mere fact that the petitioner didn't understand that shouldn't be held against him. I thought you said he has experience, he's had these injuries before, he has a long history, he's trained to write reports. I'm still trying to discern why he didn't err on the side of caution and report it to his lieutenant until months later. He knew somebody jumped on his back and he knew he was hurt, right? And he wrote in the arrest report that somebody jumped on his back, but he didn't write that he was injured. That's not an injury report. Now, you and I can wonder that, however, he did tell that there's also that objection to the note from Dr., I'll call him Dr. M, because I'll have a hard time pronouncing it, but it's not Calavo, it was the first surgeon. And when the arbitrator allowed Exhibit 6 into evidence, that was where that doctor said, yeah, he told me about it. So we know that the prior back surgeon was told about it. Didn't show up in these computerized records that we had trouble discerning throughout the testimony. You saw that, which date was what procedure. We know he told that doctor that. We know he told his chiropractor that. We know at some point it dawned on him and the lightbulb went off. You can't punish him because the lightbulb's a little dimmer than you or I may wish. You can't punish him, but the commission can take that into consideration on credibility issues, can't they? But when there's no other logical explanation, again, as my brief site indicates to us. He's got, I mean, Bernstein puts it on his pre-existing condition that his opinion is it wasn't accelerated or aggravated by this event. And it didn't trigger it. And he did give two different dates. He gave December 25th, 2010 as the date of onset to Calavo when he related the history on December 11th. And then all of a sudden it became December 13th. And the commission didn't quite like that. The commission decision, which went off on the other things, therefore had their causal connection argument somewhat prejudiced. But the point is a finding is against the manifest weight of the evidence, but an opposite conclusion is apparent. Yeah, but we're not going to get into the re-weighing business here. No, no, but the opposite conclusion is apparent. He told the Cairo the next day. He told Dr. M. That's in the narrative report that was allowed in, Exhibit 6 on the page I just cited. The mere fact that it doesn't show up in some of the physician's assistance notes before that isn't there. I've already commented on what I think about these group disability claim forms when they fill out a one, the first page copying off the physician's assistance note, and they just copy them and re-promulgate them. When you go to date of onset, it is true that it got so bad he couldn't get out of bed on Christmas basically day. But it's also true that he woke up the next morning with back pain. And it's also true that he went to the Cairo he'd been seeing all along and it got progressively worse. What didn't happen on the prior Cairos? It didn't get progressively worse. And the commission had all that evidence before it. Correct. So for them to determine what weight to give evidence, which doctor to believe when you have conflicting opinions on causation. I mean, there's conflicting evidence on both sides here. I'm having a little trouble with, you know, the opposite conclusion being apparent. Okay. Well, the reason it's apparent to me, and granted I'm the petitioner's attorney, is because. And hopefully it can make it apparent to everybody else here. I'll give up on Mike, but I'll try you five. The reason I think there's no other decision that can be rendered is what are we talking about here? Health insurance forms? That's not going to be a deciding factor. Dr. Bernstein's decision when he can't read the Cairo records and see X in it and also finds no X. I mean, that just goes out the window. You can't pick and choose who you believe on Dr. Bernstein. The case that I found pretty. Counsel, your time has expired. You'll have time on the floor. That's fine. Thank you. Sorry. May it please the court, counsel. You know, we've got a disputed case. Who are you? Oh, I'm sorry. Mike Russin on behalf of the Village of Allsup. I apologize, counsel. We had a disputed case, and it is a manifest weight case. And I respect counsel's argument, but the weight of the evidence here is overwhelming. It's not just a case where we've got a couple of forms filled out by the claimant. We had his coworker testify. We had his supervisor testify. We had his supervisor's supervisor testify. And even more importantly, we had this wonderful woman who was the administrative assistant to the chief who was doing the best she could for him by getting him his disability while he was off work, and she testified. And they all testified he didn't have a work injury. And he never reported a work injury until March of 2011. And it's not a question of filling out a couple of forms here or there. A lot of the documentation that was placed into evidence related to medical records that he completed in his own handwriting where he said the onset of my symptoms was December 25, December 26, 2010. The thing that counsel didn't mention is after this incident on December 11, and I'm not saying he didn't arrest this gentleman, but he continued to work. He continued to perform his regular work duties for the next couple of weeks. I mean, he was only off work, you know, come the Christmas holidays. So it's not a question of I had an incident and I didn't think about it and I was having all these problems. I'm back at work. I'm doing my regular job. And on December 25, December 26, I have this problem. And I see several different physicians. I see several different physical therapists. And I tell them all that the onset of my symptoms is December 25, December 26, 2010. And the first time I say anything to any doctor is after March of 2011 that this somehow relates back to an incident when I made this arrest in December 2010. So you look at the accelerated records. You look at Dr. Miskiewicz's records. You look at the forms that he filled out. You look at Dr. Maznik's records. And they're all consistent with an insidious onset. They're all consistent with an onset December 25, 2010. You look at Dr. Bernstein's report, which the Commission specifically relies on. You compare it to Dr. Calavo's report. And the most important thing that Dr. Calavo admits on cross-examination is, you know what, when I look at the medical records, they're not consistent with what the claimant gave me as a history. And I base my opinion on causation based on what the claimant told me. But clearly the medical records are inconsistent. When you're faced with that volume of conflicting evidence, I submit to you that the Commission was absolutely correct. Thank you. Thank you. Thank you, Counsel. Counsel, you may reply. The time that I've been working for a couple of weeks, his testimony was summarized on page 5 of the brief, is that he had the date of accident on 12-11, woke up in pain, worked the next day. He was then off the 13th, the 14th, the 15th. He worked the 16th through the 20th. However, he continued to see the chiropractor on the 15th, the 17th, and the 20th. And then he was off. I say he continually worked until then. He worked for a week. In between, it would seem the chiro and the symptoms were getting worse. So I don't think that supports the proposition. I do wish to point out the Luckinville case. You can obviously read all the cases, but the Ferkey case. The Luckinville case is good for me, and that's obviously why I'm citing it. But it says, despite the inconsistency between the initial statements to medical personnel concerning the onsense and the subsequent statements, they do generally reflect on credibility, but not here. Because in this situation, it's the facts and the evidence of the medical. And he did tell the doctor. The doctor wrote that narrative, Exhibit 6. It's a small one. It's in. It's in under completeness. That wasn't in Section 16. They're using those forms to impeach him. They're not using it for Section 16. So that narrative from that treater should be in, and that narrative says he told me. So all those forms go away. And then finally, the Ferkey case, which also points out the Darling case. You can't take the quantitative level of proof that's demanded by the commission as to the repetitive nature of the employment there and require that at a much higher level when the commission wanted to decide, oh, it was his home remodeling project that did it. So you have to have the same level. In Ferkey, the quantitative proof improperly demanded by the commission as to the repetitive nature of his employment was more than the commission required of the evidence it relied upon to conclude. In the cases that you're citing, did we affirm the commission? The commission, Ferkey reversed the commission. And said what? There was sufficient evidence in the record to establish that it was against the manifest way of the evidence? And specifically because they said there was too much proof. Or there was a different standard. The commission was using a different standard. On page 13 of my brief, okay, the Ferkey case, it was a carpal tunnel syndrome that was denied by the commission. The medical evidence was a little less than perfect. But the petitioner's unrebutted testimony was he had repetitive trauma for 20 years. Then he comes along and says I got a home remodeling project I did for a couple of weeks. Then carpal tunnel, et cetera. So they deny it on cause of connection. How do we know it's not that home repair product? And the appellate court said, and rightfully so, the quantity of proof on the one, you can't have it, this is the quantity, oh, here's this little home remodeling project, and hold that against the 20 years. So you have to think about it in those terms. If no manifest way cases were ever reversed, they would just outlaw manifest way cases. I suppose your argument would be a little more attractive if this guy could have a course of events argument. But he can't. This guy's got a bad back to start with. Correct. He's not starting with an uninjured back. I agree. He's got one bad back. So now we've got a bad back and we do have a doctor's opinion stating, Bernstein, such as it is, stating no cause of connection. You know, there's no right answer to these cases. Well, there is a right answer. He could have gone the other way and he would have been arguing the same thing and you'd be arguing his argument. Well, that is correct. However, there is nothing Bernstein that's credible. You can't change the standard. Bernstein says there's no accident. He read the Cairo notes. It's in the Cairo notes. You can't say, so now we're going to rely on that and then not rely on the other side. Your Honor, if it's not a question of weight, I mean, if he had said that he arrived at his opinion through the consultation of the entrails of chickens, you would have turned around and said, strike it. Get it out of here. It's not evidence. But no one went to strike his testimony. You leave it as weight, a question of weight. And that, again, goes to the commission. What weight to give to Bernstein? It's a 19 minutes narrative. We took the evidence out of the treater. And, frankly, with all due respect, I think it's, and it's been cited in a lot of Mike's briefs, the Chicago Messenger case. You have a duty to reverse when it's against the manifest way of the evidence. I think this one's against the manifest way of the evidence. I understand that's a big record. And I understand there's a lot of exhibits in there. And I'm just saying that if you look closely, there are red areas. If the forms don't count. If the very doctor, Dr. M, who we're going to rely on his physician's notes and all this to hang him, says in his narrative on Exhibit 6, he did tell me it happened at work. And you've got such a specific opinion by Dr. Collado throwing out that it could be no apparent cause. There's nothing left. You can't ask more of the petitioner's side than you do of the respondent when you're doing the balancing. Yes, I have the burden of proof. I agree. But we know there's an accident. We know there's notice. If it's not waived under HA, as soon as it was apparent to him, he reported it. Now, the cause of connection gets a little polluted in these shotgun or scattergun cases. And that's what an appellate court is for, to kind of look through a busy administrative record and see just what is in there when you sift through. And if you sift through this, I think what you'll see is Bernstein is nothing. He had a 1 or a 2 before, Your Honor. It's not like he had an awful back. The last note said, no herniated pulposis. Thank you. Thank you, Mr. Keeley and Mr. Rusin. Thank you, counsel, both for your arguments. This matter will be taken under advisement that this position shall issue. The court will stand in brief recess for lunch and will reconvene at 1.30.